# Exhibit B

Deposition

```
 1              UNITED STATES DISTRICT COURT
               DISTRICT OF SOUTH CAROLINA
 2                 CHARLESTON DIVISION
 3    NELSON L. BRUCE,
 4              Plaintiff,
 5         vs.        CASE NO. 2:22-cv-01292-BHH-MGB
 6    REV FEDERAL CREDIT UNION,
      TRANS UNION, LLC, AND
 7    UNKNOWN DOES 1-100,
 8              Defendants.
 9
10    VIDEOCONFERENCE  NELSON L. BRUCE
      DEPOSITION OF:
11
      DATE:           November 20, 2023
12
      TIME:           11:00 a.m.
13
      LOCATION:       144 Pavilion Street
14                    Summerville, SC  29483
15    TAKEN BY:       Counsel for the Defendant
16    REPORTED BY:    KAREN NELLIUS, RPR
                      (Appearing via videoconference.)
17    _____
18
19
20
21
22
23
24
25
                                              Page 1
```

```
1    APPEARANCES OF COUNSEL:
2         ATTORNEYS FOR PLAINTIFF
                  NELSON L. BRUCE:
3
                  NELSON L. BRUCE, PRO SE
4                 BY:  NELSON L. BRUCE
                  (Appearing via videoconference.)
5                 144 Pavilion Street
                  Summerville, SC  29483
6                 Leonbruce81@yaoo.com
                  843-437-7901
7
          ATTORNEYS FOR DEFENDANT
8                 TRANSUNION, LLC:
9                 QUILLING, SELANDER, LOWNDS, WINSLETT
                  & MOSER
10                BY:  KYLE PIETRZAK
                  (Appearing via videoconference.)
11                6900 N. Dallas Parkway
                  Suite 800
12                Plano, TX  75024
                  214-871-2100
13                Kpietrzak@qslwm.com
14
15           (INDEX AT REAR OF TRANSCRIPT)
16
17
18
19
20
21
22
23
24
25
```

1          A.   It depends on where it's located, yes.

2          Q.   Okay.  So would you frequently go to

3     these properties?

4          A.   I would drive around neighborhoods

5     looking at properties, yes.

6          Q.   Okay.  The Bank of America card was the

7     only credit in the name of Capital Return

8     Investments, correct?

9          A.   That's all I can recall at the moment.

10         Q.   Okay.  Any other sources of income in

11    the past five years?

12         A.   I don't believe so.  I'm not a hundred

13    percent sure.  I've pretty much been kind of

14    focusing on my cases, and stuff, so...

15         Q.   How much --

16         A.   I was kind of letting it sit back.

17         Q.   I apologize for talking over you there.

18    Can you repeat that last part for us.

19         A.   I said I was pretty much focused on the

20    lawsuits I have.  So I haven't been doing a lot of

21    business, so I can't recall what I've been making

22    or doing anything, other than focusing on this

23    stuff.

24         Q.   Have the settlements you received from

25    the lawsuits been sufficient to cover your living

1    expenses in the past three years?

2          A.    It's been enough.

3          Q.    No other sources of income whatsoever

4    besides the money you've received from assisting

5    others with credit issues, which you've testified

6    is no more than seven people, correct?

7          A.    I'm not sure of the exact number.  So

8    I'm not sure if it's seven.

9          Q.    Could it be more than seven?

10          A.    I don't -- I don't recall.

11          Q.    So besides that source and the money

12    you've received through your lawsuits, have you

13    received any other income in the past five years?

14          A.    Not that I recall, no.

15          Q.    Are you married?

16          A.    No.

17          Q.    Any kids?

18          A.    A son.

19          Q.    Okay.  Does he live with you?

20          A.    No.

21          Q.    Do you get to see him a lot?

22          A.    Yes.

23          Q.    Do you pay any child support or any

24    domestic support obligations?

25          A.    No.

Veritext Legal Solutions
800-336-4000

```
 1    was filed 6/13/17, and then jump over here to the
 2    left side to debtor, Nelson Leon Bruce, and with
 3    the last four of social is 7185.  Is there any
 4    reason that this document here -- I'm sorry.
 5    Strike the very last part.
 6            Any reason to believe that this record
 7    here does not reflect your bankruptcy?
 8        A.   No.
 9        Q.   Okay.  Did you, in fact, file a Chapter
10    13 bankruptcy on June 13th, 2017?
11        A.   Yes.
12        Q.   Okay.  What was the intent behind
13    filing that bankruptcy?
14        A.   I'm not sure.  I think it was just a
15    reaction, just to file it, based on a lot of stuff
16    that was going on at the time.
17        Q.   What sort of stuff?
18        A.   I had a foreclosure, which is still
19    pending, and I think some other issues as far as
20    with PenFed.
21        Q.   So you intentionally filed the Chapter
22    13 bankruptcy?
23        A.   I filed it as an option.  At the time I
24    just didn't know what direction to do.  I thought
25    that was my only option.
```

Page 31

```
 1      insurance payments?

 2             A.    Yes.

 3             Q.    Looking back at our document here, it

 4      says date filed 6/13, and then below it it says

 5      debtor dismissed 7/7/2017; is that correct?

 6             A.    I don't know if that's the exact date,

 7      but looking at the document I can say yes.

 8             Q.    Okay.  So you agree that the court's

 9      website is showing that this case was dismissed on

10      7/7/2017; is that correct?

11             A.    Based on what I'm seeing on the

12      document.

13             Q.    Okay.  And do you have any reason to

14      believe that this document is incorrect?

15             A.    I know it was dismissed.  So as far as

16      being dismissed it's correct.

17             Q.    Okay.  Just a second here.

18                   MR. PIETRZAK:  And if we could mark

19      that docket sheet as Exhibit 2.

20                   (DEFENDANT EXHIBIT 2, BANKRUPTCY

21      DOCKET, was marked for identification.)

22                   (DEFENDANT EXHIBIT 3, ORDER OF

23      DISMISSAL, was marked for identification.)

24      BY MR. PIETRZAK:

25             Q.    This third document here I would like
```

Page 34

```
 1    to mark as Exhibit 3.  This is the order of
 2    dismissal.  Do you see it there on your screen?
 3    It's labeled docket number 34.  Do you see that
 4    there, sir?
 5         A.   Yes.
 6         Q.   And I'm going to scroll down to the
 7    second page, and do you see it there where it says:
 8    This matter is before the court on a motion to
 9    dismiss pursuant 11 U.S.C. 1307 filed by Nelson
10    Leon Bruce.  It is ordered that, one, the case of
11    Nelson Leon Bruce is dismissed.  Do you see that
12    there?
13         A.   Yes.
14         Q.   Do you disagree with anything on this
15    form?
16         A.   It's been dismissed, so no.
17              (DEFENDANT EXHIBIT 4, LETTER FROM
18    NELSON BRUCE TO US BANKRUPTCY COURT, DATED 8/19/21,
19    was marked for identification.)
20    BY MR. PIETRZAK:
21         Q.   Okay.  The next I'll go to is Exhibit
22    4, please.  And this is a letter also available on
23    the court's website where it appears to be an
24    August 19th, 2021 letter that you had sent to the
25    bankruptcy court.  What was your intention in
```

Page 35

```
 1    showing on the report, on this document.
 2         Q.   And it says -- do you believe what it's
 3    showing on this document here is inaccurate?
 4         A.   Like I said, it's showing dismissed.
 5    So it looks accurate.   As far as being dismissed,
 6    dismissed for other reasons.
 7              (DEFENDANT EXHIBIT 5, LETTER FROM
 8    UNITED STATES BANKRUPTCY COURT TO NELSON BRUCE,
 9    DATED 8/24/21, was marked for identification.)
10    BY MR. PIETRZAK:
11         Q.   And we'll go to Exhibit Number 5, which
12    I believe is the letter from the bankruptcy court
13    that you referenced.
14         A.   Correct.
15         Q.   And this letter I believe is dated
16    after the letter we just viewed.  So this is August
17    24.  The previous one was August 19.  Correct?
18         A.   I'm not sure what you are referring to.
19         Q.   We'll move on.
20         A.   Okay.
21         Q.   So is this the letter that you received
22    from the bankruptcy court?
23         A.   Correct.
24         Q.   Okay.  And in there it says the
25    bankruptcy court does not report the records of the
```

Page 38

```
 1      court to any credit bureau; is that correct?
 2              A.   That's correct.
 3              Q.   Okay.  But it also says that all
 4      documents filed in a bankruptcy case are public
 5      records unless otherwise ordered; is that correct?
 6              A.   Correct.
 7              Q.   Are you contending that the documents
 8      in your bankruptcy are not part of the public
 9      record?
10              A.   If it says public record, then yes,
11      it's part of the public record.
12              Q.   Okay.  Do you believe that anybody who
13      has access to the public record could go on there
14      and see that you filed bankruptcy?
15              A.   If they have access.
16              Q.   Why did you decide to have your case
17      dismissed?
18              A.   For legal reasons.  I initially thought
19      I could kind of litigate it through bankruptcy, but
20      that was not the direction.  After kind of
21      reviewing stuff, I knew that I couldn't do it so I
22      wanted to get it dismissed so I could sue the way I
23      wanted to sue.
24              Q.   Okay.  What is your understanding of
25      the implication of having a case voluntarily
```

Page 39

```
1              A.    Well, I have to ask them how they
2       report it because they already responded to what I
3       filed.
4              Q.    They responded to your question that
5       was very limited, that says only tell me about this
6       part, correct?
7              A.    Yes.  So I would have to review any
8       documents versus somebody else's filing, whether
9       they actually put voluntary dismissal.  They just
10      put dismissed for other reasons.
11             Q.    But you haven't in any way explored or
12      done any of that with the bankruptcy court,
13      correct?
14             A.    Correct.
15             Q.    Okay.
16             A.    I will probably ask them now that you
17      brought that up, but yeah.
18             Q.    How many lawsuits have you filed in the
19      past five years?
20             A.    I don't recall.  It could be five or a
21      little bit more.  I'm not sure.
22             Q.    Okay.  Could you list those for me,
23      please?
24             A.    You are talking as far as the
25      defendants?
```

Page 43

```
 1    and this was reported on 12/12/2020.  Do you agree
 2    with that?
 3              A.   Yes.
 4              Q.   You agree that this was within 30 days
 5    of your initial dispute, which was 12/4/2020?
 6              A.   Yes.
 7              Q.   Okay.  Do you recall receiving these?
 8              A.   I believe so.
 9              Q.   Okay.  First, here it says:  We
10    investigated the information you disputed and
11    updated.  Here is how the item appears on your
12    credit report following our reinvestigation.  It
13    says REVCFU.  I know that you disputed Heritage.
14    Are these one and the same for our discussion in
15    this lawsuit?
16              A.   Yes.
17              Q.   Okay.  So it states here that it was a
18    deposit account overdraft protection with a balance
19    of 471.  Do you recall receiving this?
20              A.   Yes.  The results.
21              Q.   Okay.  And then this next part here it
22    says:  Investigation results, verified as accurate.
23    We investigated the information you disputed and
24    the disputed information was verified as accurate.
25    Here is how it reports.  It says the US Bankruptcy
```

Page 71

```
 1                  Okay.  Do you agree that you received a
 2      copy of this letter?
 3           A.   Yes.
 4           Q.   Okay.  So I'm going next to this next
 5      section.  So were you satisfied with the results of
 6      this investigation?
 7           A.   I don't believe so, which was probably
 8      why I disputed it again.
 9           Q.   Okay.  Based upon your telling
10      TransUnion that these accounts were not yours, do
11      you believe that TransUnion verified that these
12      accounts were, in fact, yours?
13           A.   No, I don't believe they did because
14      they didn't provide any documents showing that it
15      was.
16           Q.   Are they yours?
17           A.   They are mine, but TransUnion never
18      provided documents showing that it was mine.
19           Q.   So moving on to this next part here, it
20      says:  If our investigation has not resolved your
21      dispute, here is what you can do next, and then it
22      lists your categories there.  I'll just read the
23      first part in bold.  I'm happy to go through them
24      in more detail if you wish.  The first one is add a
25      consumer statement to your credit report, the
```

Page 73

1    already said they don't report, so there is no need

2    to dispute other than what I requested from them.

3         Q.    But you agree that the bankruptcy court

4    has your case as dismissed, correct?

5         A.    Well, that's the court requirements,

6    that that's how they report stuff.

7         Q.    And you agree that TransUnion's

8    reporting mirrors the court's reporting?

9         A.    TransUnion's reporting is mirroring the

10   court's reporting, but under the Fair Credit

11   Reporting Act, they are not required to follow

12   exactly what the court is reporting.  They are

13   required to report a certain way if they know --

14   when they know that it's been dismissed before the

15   court adjustment of the case.

16        Q.    Thank you very much.

17             Did you provide TransUnion with any

18   additional documentation regarding the accuracy of

19   the bankruptcy reporting?

20        A.    I didn't.

21        Q.    And why not?

22        A.    Because it's not required.

23        Q.    So did you agree that TransUnion in

24   response to your 12/20 dispute sent you the --

25   timely sent you the results of the reinvestigation?

Page 77

```
 1          Q.   You don't disagree with them?

 2          A.   I don't agree with them.

 3          Q.   Okay.  And what do you feel is

 4   reporting inaccurate as was updated?

 5          A.   I don't see that it is showing that it

 6   is disputed by the consumer.

 7          Q.   Is that the only basis on which you

 8   feel that this is now reporting -- or still

 9   reporting inaccurate?

10          A.   Again, it would probably be the balance

11   as well.

12          Q.   But you agree that this was an account

13   of yours?

14          A.   I have an account with REV.

15          Q.   Okay.

16          A.   I don't agree to what they are

17   reporting because I disputed this account.

18          Q.   And you agree that you did not pay the

19   debt owed to REV?

20          A.   That was -- the debt is what's in

21   dispute.

22          Q.   And you agree that the account was

23   charged off?

24          A.   I agree that REV did charge off the

25   account.
```

Page 130

```
 1    on credit applications?
 2            A.   I guess it relates to mostly denials.
 3            Q.   Okay.   What denials are you associating
 4    with this case?
 5            A.   So far as -- I'm trying to remember the
 6    name of the bank.   I think it's Tower Federal
 7    Credit Union.
 8            Q.   Okay.
 9            A.   It was denied.  I think they labeled
10    the bankruptcy as part of the reason.
11            Q.   Okay.  Give me a quick second here.
12                 Tower.  So I will mark this as 24.
13                 (DEFENDANT EXHIBIT 24, DENIAL LETTER TO
14    NELSON BRUCE FROM UNIFY FINANCIAL FEDERAL CREDIT
15    UNION, DATED 12/6/21, was marked for
16    identification.)
17    BY MR. PIETRZAK:
18            Q.   Do you recognize this document on the
19    screen?
20            A.   Yes.
21            Q.   Okay.   It looks like this was December
22    12th of 2021?
23            A.   Correct.
24            Q.   Okay.  How much were you applying for
25    when you applied for this?
```

Page 171

1          A.    I think originally it was 30,000.

2          Q.    What did you need the credit for?

3          A.    More likely trying to get back into

4    investments.

5          Q.    What type of investments?

6          A.    Back into real estate.

7          Q.    Did you have any specific investments

8    in mind when you applied for this card?

9          A.    No.  Because I'm trying to more likely

10   just build up the credit to get enough credit to

11   figure out which type of investments I will be

12   going into.

13         Q.    Did you apply in the name of your

14   company or your personal?

15         A.    Personal.

16         Q.    Why didn't you apply for a business

17   loan?

18         A.    I just didn't apply for business.  I

19   don't think they offer that as part of their

20   products.

21         Q.    Did you ask?

22         A.    I think it was online where it doesn't

23   show.  They give you certain options.

24         Q.    Did you decide that 30,000 was the

25   amount or how did you come up with that number?

Veritext Legal Solutions
800-336-4000

```
 1              A.    No.
 2              Q.    And how many different banks did you
 3      apply for within the 60 days of this Tower
 4      application?
 5              A.    I believe three, maybe.
 6              Q.    On this application here, when we
 7      scroll down, do you see there that they selected a
 8      couple different reasons?
 9              A.    Yes.
10              Q.    You see one of them is bankruptcy,
11      correct?
12              A.    Yes.
13              Q.    Okay.  Do you know that they got the
14      public records from TransUnion as far as the
15      bankruptcy?
16              A.    As far as they are showing, all they
17      show is that they pulled TransUnion.
18              Q.    If Tower had gone to PACER and pulled
19      up, what would they have seen when they ran your
20      application?
21              A.    I don't know.  I don't know what they
22      look for.
23              Q.    Do you know for a fact they relied
24      solely on TransUnion for the public record
25      bankruptcy?
```

Page 174

```
 1              A.   According to the documents showed they
 2      relied solely on TransUnion related to what I was
 3      requesting.
 4              Q.   Okay.  I don't see on here where it
 5      says that they pulled the bankruptcy information
 6      off the TransUnion file only.  Where is the
 7      language that says that they only pulled it off
 8      there?
 9              A.   I don't see it, but my report has that
10      bankruptcy on there.
11              Q.   Okay.
12              A.   And that's where they said they pulled
13      the information from.  Otherwise they would
14      document it wherever else they got it from.
15              Q.   But you don't know that they didn't
16      also verify the bankruptcy with the bankruptcy
17      court or PACER, correct?
18              A.   Correct.
19              Q.   Okay.  And this part here, the other,
20      where it says excessive new debt, what do you think
21      that's in regards to?
22              A.   I don't know.  They didn't really
23      specify.
24              Q.   Okay.  What on your TransUnion credit
25      report are you attributing or blaming for the
```

Page 175

1          A.    More so just being depressed at some

2    point, headaches, that type of stuff.

3          Q.    Just the headaches?  That's the only

4    physical?

5          A.    Yeah.  That's the only physical I can

6    recall.

7          Q.    How often did you have the headaches?

8          A.    I don't recall how often.

9          Q.    Was it daily?

10         A.    I can't say it was daily.

11         Q.    Was it weekly?

12         A.    I'd say probably once or twice a month,

13   maybe.

14         Q.    And you answered in your discovery

15   responses that you take Tylenol and BC Powder.

16   What is BC Powder?

17         A.    It's like Tylenol in a way but it acts

18   faster.

19         Q.    Is that an over-the-counter thing?

20         A.    Yes.  Yes.  It's like an aspirin.

21         Q.    Okay.

22         A.    In powder form.

23         Q.    What's the cost of BC Powder compared

24   to Tylenol, roughly?

25         A.    Probably the range about the same.  You

Page 193

1     providing to T-Mobile and Bank of America.

2         A.   That was part of the section, but I

3     believe it does say -- it starts talking about

4     bankruptcy before it gets to that, and permissible

5     purpose -- then I start specifying more of it being

6     both not just REV but also related to the

7     bankruptcy -- not Bank of America, but also related

8     to the bankruptcy.  So it's not just T-Mobile and

9     REV.  I forget which paragraph that was, but I did

10     go back and review it.  I just don't recall which

11     paragraph it was.  It probably could be more

12     detailed.

13         Q.   For common law defamation, 250,000,

14     what's the basis of that amount?

15         A.   It's just based off of the standards

16     that I see in cases, in previous cases.

17         Q.   What are your actual damages?

18         A.   It's probably all kind of related to

19     the inaccuracies, the stress, the emotions, and all

20     that is kind of related.

21         Q.   But I thought we agreed that the only

22     actual damages and stress as far as the humiliation

23     and that goes was with regards to Tower, correct?

24         A.   I don't think that's correct.  As it

25     related to the denial, but not related to the

Page 215

1    accuracy in reporting.

2          Q.    So what other reporting of TransUnion's

3    report was defamatory and caused you damages?

4          A.    Well, what they are reporting.    They

5    are not reporting the bankruptcy as withdrawn.

6          Q.    To whom?

7          A.    Well, in their -- to anybody.    Anybody

8    that's pulling my report.

9          Q.    Okay.    Let's go through that.    I'm

10   going to show you a disclosure here from 2/6/23,

11   and we'll look down here in the regular inquiries

12   section.

13         A.    Okay.

14         Q.    So Capital One in 1/20/23, so you

15   contend that you were defamed on this inquiry?

16         A.    I think most of that goes towards the

17   previous inquiries.    This is a later report.    A lot

18   of stuff already fell off.

19         Q.    So let me go ahead -- in what range

20   were you -- is the dispute allegation?

21         A.    If you have an early 2021 report, I

22   think the March 2021, I think that's what you had,

23   March or May, you will see some inquiries there.

24   But Tower is one of them.    Obviously Capital One

25   did receive a report, which is why I got a high

Page 216

```
 1                    CERTIFICATE OF REPORTER

 2

 3              I, Karen Nellius, Court Reporter and

 4     Notary Public for the State of South Carolina at

 5     Large, do hereby certify that the foregoing

 6     transcript is a true, accurate, and complete

 7     record.

 8              I further certify that I am neither

 9     related to nor counsel for any party to the cause

10     pending or interested in the events thereof.

11              Witness my hand, I have hereunto

12     affixed my official seal this 6th day of December,

13     2023 at Charleston, Berkeley County, South

14     Carolina.

15

16

17

18

19

20

21

22

               Karen Nellius, RPR

23             My Commission Expires

               November 14, 2024

24

25

                                        Page  228
```